**FILED**
2:58 pm, Jun 02, 2016
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Laura A. Briggs, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JAMES GILMAN,
    Plaintiff,

vs.

CORIZON MEDICAL SERVICES;
REGIONAL MEDICAL DIRECTORS;
MONICA GIPSON, RN, Director- Medical
    and Clinical Health Care Services;
ESTER HINTON, Medical Contract
Monitor;
DR. SAMUEL BYRD, MD
AMY WRIGHT, RN;
C. PEARISON, MA;
B. RIGGS, RN;
KIM HOPSON, RN, WVCF Health Service
    Administrator;
        Defendants.

Case No.: 2:16-cv-194-JMS-MJD
(TO BE SUPPLIED BY THE CLERK)

# COMPLAINT

## I. PARTIES

A. Plaintiff:

    Name **JAMES GILMAN**

    Identification Number **#110906**

    Address **M-115-L, WVCF, P.O. BOX 1111, Carlisle, IN 47838**

B. Defendant(s)

    Name **CORIZON MEDICAL SERVICES**
    Address **I.G.C.S., 302 W. WASHINGTON ST.,**
        **Indianapolis, IN 46204**

    Name **Current Director Unknown, Dr. B. BULLER, Dr. C.**
        **KUENZLI, Dr. BARTLES, Dr. MITCHEFF**
    Title   **Regional Medical Directors**
    Address **I.G.C.S., 302 W. Washington St.,**
        **Indianapolis, IN 46204**

Name **MONICA GIPSON, RN**
Title **Director of Medical and Health Care Services**
Address **I.G.C.S., 302 W. Washington St.,**
        **Indianapolis, IN 46204**

Name **ESTER HINTON**
Title **Medical Contact Monitor**
Address **I.G.C.S., 302 W. Washington St.,**
        **Indianapolis, IN 46204**

Name **DR. SAMUEL BYRD**
Title **WVCF- Medical Doctor**
Address **Old State Road 41, P.O. Box 500, Carlisle, IN 500**

Name **AMY WRIGHT**
Title **WVCF- Registered Nurse**
Address **Old State Road 41, P.O. Box 500, Carlisle, IN 500**

Name **C. PEARISON**
Title **WVCF, MA**
Address **Old State Road 41, P.O. Box 500, Carlisle, IN 500**

Name **B. RIGGS**
Title **WVCF- Registered Nurse**
Address **Old State Road 41, P.O. Box 500, Carlisle, IN 500**

Name **KIM HOPSON**
Title **WVCF Health Services Administrator**
Address **Old State Road 41, P.O. Box 500, Carlisle, IN 500**

    **II.**    **STATEMENT OF JURISDICTION AND PREVIOUS LAWSUITS:**

Jurisdiction over this action exists in the United States District Court for the Southern District of Indiana because **all of the medical instances occurred at the Wabash Valley Correctional Facility which is in the Southern District of Indiana.**

Any additional actions of the above named defendants that may or may not be considered as Malpractice should be accepted under **SUPPLEMENT JURISDICTION pursuant to 28 U.S.C. 1367, in that all of their actions contributed to the DELIBERATE INDIFFERENCE of causing UNDUE PAIN AND SUFFERING to the Plaintiff.**

The Plaintiff furthermore requests that this Court accept jurisdiction of the actions of the Wabash Valley Correctional Facility MEDICAL STAFF that occurred from 2001

until the present date because the **DELIBERATE INDIFFERENCE** to the Plaintiff's knees has been an **ONGOING ISSUE** since 2001, without a break in time, and has contributed to the present Complaint. There are over 300+ documents in the Plaintiff's medical records, **ALL** pertaining to the Plaintiff's knee problem dating back to 2001 and the **UNDUE PAIN** and **SUFERING** that the WVCF Medical Staff has left the Plaintiff in throughout those years leading to the present date.

If the same facts alleged or claims made in this suit have been previously presented to any other state or federal court in an earlier suit, for each such earlier suit identify the parties, the Court in which it was filed, the docket number assigned to the suit, the status of such earlier suit, (for example: pending, dismissed, set for trial, on appeal, etc.). and the nature of the disposition if the earlier case is closed. *U.S. District Court - 2:07-CV-0016l-LJM-TAB / Summary Judgement awarded to Defendants → Appealed U.S. Ct. Appeals - 10-3537 / Dismissed*

### III. CAUSE OF ACTION

Ground 1: Gilman's Eight Amendment Rights were violated when **CORIZON**, through its representatives, the **Regional Medical Directors: Current Director Unknown** *Oct 2015* to present; Dr. **BRYAN BULLER**- *Sept 2015* to *October 2015*; Dr. **CARL KUENZLI**- *May 2015* to *Sept 2015*; Dr. **MANDIP BARTLES**- *Mitcheff* to *December 2014*; Dr. **MITCHEFF**- Unknown to *Bartles*; **MONICA GIPSON**; and **ESTER HINTON**, did with **DELIBERATE INDIFFERENCE**, cause Gilman to submit to **UNDUE PAIN** and **SUFFERING** by 1) dictating the on-site physician to follow **CORIZON'S Pre-written book of treatments**; 2) **DENYING** the on-sight physician's requests for **PROPER TREATMENTS** without doing their own examinations in person; and 3) **FAILING** to ensure there were enough Medical Doctors to handle the patient load between September 2015 through December 2015, at the Wabash Valley Correctional Facility. *Estelle v. Gamble, 50 LED 2d. 251, 429 U.S. 97 S. Ct. 1976*; and *Brown v. Hughes, et al., 984 F. 2d 1533 (U.S. Ct. App. 1990).*

Ground 2: Gilman's Eighth Amendment Rights were violated when **DR. BYRD**, with **DELIBERATE INDIFFERENCE**, caused Gilman to submit to **UNDUE PAIN** and **SUFFERING** by 1) **FAILING** to ensure that Gilman received the cortisone injection that he

prescribed in October 4, 2015 and 2) **FAILING** to ensure that the **UNDERLYING SOURCE** causing Gilman's **PAIN** and **SUFFERING** was properly dealt with. *Estelle v. Gamble, 50 LED 2d. 251, 429 U.S. 97 S. Ct. 1976; Brown v. Hughes, et al., 894 F. 2d 1533 (U.S. Ct. App. 1990).*

Ground 3: Gilman's Eighth Amendment rights were violated when **AMY WRIGHT, RN; B. RIGGS, RN; C. PEARISON, MA;** and **KIM HOPSON, RN,** did with **DELIBERATE INDIFFERENCE** cause Gilman to 1) submit to **UNDUE PAIN** and **SUFFERING** from October 2015 until January 2016, after the on-site physician prescribed a **PAIN CONTROL** injection of cortisone on October 4, 2015, and the defendant effectively made Gilman wait until after the January 4, 2016 Chronic Care for the injection and 2) **DENIED** Gilman's March 2016, request for MD Sickcall, making Gilman wait until April's Chronic Care Appointment to see the MD for his **PAIN**. *Estelle v. Gamble, 50 LED 2d. 257, 429 U.S. 97 S. Ct. 1976; Brown v. Hughes, et al., 894 F. 2d 1533 (U.S. Ct. App. 1990).*

## IV. STATEMENT OF FACTS

### PRIOR FACTS- 2001-2014

1) **In 2001, Gilman began being treated for extreme pain in his right knee.**

2) **Between 2001 through 2005, the WVCF MD's prescribed IBU 800's- three times a day; Naproxen 500's- three times a day; and Mobic daily; none of these oral pain medications worked to control the pain that Gilman's knees caused.**

3) **In the interim, the UNRESOLVED PAIN and limping, caused Gilman's Left Knee to begin to hurt.**

4) **X-rays were taken on Gilman's right knee which revealed that there were LOOSE BODIES in Gilman's right knee.**

5) In about 2005, Gilman began receiving Cortisone injections in BOTH knees, every six (6) months for PAIN control.

6) By 2008, the necessity for injections every six (6) months shrank to having the injections every two (2) months.

7) The different MD's began refusing to administering the injections, thus leaving Gilman in PAIN for months at a time.

8) In January 2009, Gilman was moved to the Southside of WVCF, where Dr. Rogan restarted the injections, and was able to get approval for Gilman to receive an MRI from the Mobil MRI Truck, for Gilman's Left Knee ONLY.

9) On October 30, 2009, an MRI was completed which revealed that there was a nearly complete tear of Gilman's Left Knee ACL. [Exhibit #1]

10) Dr. Rogan explained, in depth, about the draw-backs of injections and gave Gilman the choice of continuing the injections or not. Because oral pain medications could not control the PAIN, and CMS would not do what was necessary to fix the underlying cause of the PAIN, Gilman chose to continue the Cortisone injections every two(2) months for QUALITY OF LIFE.

11) On August 27, 2010, while filling in for Dr. Rogan, Dr. Person, MD, the Assistant Regional Medical Director, submitted a request for Orthopedic Consult to Dr. Mitcheff, the Regional Medical Director. [Exhibit #2]

12) On that same day, Dr. Mitcheff, instead of doing the right thing and approve the Orthopedic Consult, Mitcheff responded in an E-mail, "Why not use a Lennox Hill type brace (specific for ACL) and pain control. Only other thing for this guy is joint replacement. [Exhibit #3]

13) Dr. Person gave Gilman a cortisone injection in both knees the following day, which ONLY lasted for two (2) months.

14) When the new MD refused to provide another injection in October, leaving Gilman in PAIN again for three (3) months, Gilman contacted CMS which responded, "The record indicates you are being treated with a lennox-hill type brace... You are also receiving pain control measures such as Naproxen and INJECTIONS EVERY TWO MONTHS. [Exhibit #4]

15) When Gilman still did not receive an injection, he again wrote Corizon, the Medical Service that took over in place of CMS, who responded on June 13, 2011, "You have been provided with a brace and pain control medication such as Naproxen and INJECTIONS EVERY TWO MONTHS." [ Exhibit #5] In the interim, Gilman finally got a cortisone injection on May 19, 2011.

16) After being left LIMPING AND IN PAIN for two and three months at a time, Corizon approved four (4) Physical Therapy sessions. [Exhibit #6]

17) After Twelve (12) years of PAIN, Corizon finally approved an Orthopedic Consult and SURGERY FOR ONE KNEE.

18) The surgeon notified Gilman that he had approval to ONLY ONE (1) KNEE. Prior to surgery, the Surgeon asked Gilman, "Which one of your knees do you want me to do?" At the time of the surgery, Gilman's left knee hurt the worst, so that is the knee that was replaced.

19) After the rehabilitation of Gilman's left knee was complete and Gilman began walking again, the PAIN in Gilman's right knee RETURNED as bad as it had been before his left knee had replaced.

20) Because oral medication sis not work, the cortisone injections resumed every two months in Gilman's right knee.

21) After this, there was a turn-over of MD's at WVCF, and Gilman was seen by Dr. Naveen Rajoli, MD, as a fill-in who WOULD NOT give injections because a) He (Dr. Rajoli) did not believe in injections; and b) Dr. Rajoli believed that, "PAIN IS SUBJECTIVE." Dr. Rajoli left Gilman LIMPING IN EXTREME PAIN.

22) Once Dr. Byrd began working at WVCF, he re-started the cortisone injections every three (3) months, which left Gilman in PAIN one (1) month out of every three (3) months, because the injections only lasted for two (2) months.

## CURRENT FACTS

### Defendants- CORIZON MEDICAL SERVICES; All REGIONAL MEDICAL DIRECTORS ; MONICA GIPSON, RN/ and ESTER HINTON, ? :

23) CORIZON must be consulted and they must give their approval for ALL SERIOUS MEDICAL TREATMENTS, including steroid injections, consultations, Physical Therapy, and all NON-OVER THE COUNTER MEDICATION, even when they have NO interaction and NO ability to examine the offender first-hand. This places CORIZON directly as a RELIABLE PARTY in this case.

24) CORIZON maintains a 'PLAYBOOK' that dictates all the steps that the on-sight physician must take BEFORE getting to the PROPER TREATMENTS that are required. CORIZON through their REGIONAL MEDICAL DIRECTORS routinely DENY the on-sight physician's request for PROPER TREATMENT until they have exhausted CORIZON'S PUBLISHED REQUIRMENTS that mostly do not pertain to PAIN CONTROL or SOLVING THE UNDERLYING PROPLEM CAUSING THE PAIN. [i.e. the necessity for issuing a cane, knowing that the cane will not stop the PAIN] [Exhibit #7]

25) When Gilman requested Dr. Byrd to submit a request to CORIZON for an Orthopedic Consult, Dr. Byrd instructed Gilman that as long as he could walk to chow, CORIZON WOULD NOT DO ANYTHING.

26) Between September 2015 and December 2015, Gilman was left in LIMPING AND IN PAIN, because the nursing staff would not hold Procedure Clinic, SPECIFICALLY because CORIZON WOULD NOT PROVIDE A SECOND MD TO WVCF MEDICAL TO KEEP UP WITH THE MEDICAL NEEDS OF THE OFFENDERS HOUSED AT WVCF.

27) Although the cortisone injections were started back-up for Gilman's right knee, defendant's MONICA GIPSON AND ESTER HINTON, representatives of CORIZON, responded to Gilman's grievance that, "this is not a prescribed ongoing injection." [Exhibit #8] This after CMS and CORIZON both previously issued correspondence that injections WERE part of the PAIN CONTROL TREATMENT for Gilman's knee. [Exhibit #'s 4, 5]

28) At the January Chronic Care appointment, Dr. Byrd issued Gilman a walking cane because that was one of CORIZON'S REQUIRED TREATMENTS, even though a walking cane CAN DO NOTHING TO RESOLVE PAIN.

29) On or about January 14, 2016, Dr. Byrd submitted a request for an ORTHOPEDIC CONSULT. CORIZON through their REGIONAL MEDICAL DIRECTOR, the RMD, responded, "As long as he is AMBULATORY, treat with NASAID's, Injections not less than 90 days", just like Dr. Mitcheff (the prior RMD) did in #12 above. It has already been proved that NASAID's- DO NOT WORK for the PAIN that is caused by the Plaintiff's knee.

30) After the January Chronic Care appointment, CORIZON ordered Gilman to have

Physical Therapy for 6 weeks. While the therapy did help add 4 degrees of movement to Gilman's knee over the six (6) week period, it had already been proven in 2012 that Physical Therapy did nothing for the PAIN, and during the fourth visit in this session, the Cortisone injection wore off showing again that Physical Therapy does NOTHING FOR PAIN in Gilman's right Knee.

31) During the week four Therapy session, Dr. Byrd instructed Gilman that CORIZON had DENIED his request for an Orthopedic Consult, and CORIZON had suggested that Gilman be placed on oral pain medication, even though it had already been proven that ORAL PAIN MEDICATIONS DO NOT WORK ON GILMANS KNEE PAIN.

**Defendant SAMUEL BYRD, MD:**

*It should be noted that Gilman does not know the extent of Dr. BYRD's LIABILITY because of the role that CORIZON plays when they DICTATE what the on-sight physician can or can not do; and the role that the NURSING STAFF plays when they DICTATE when an offender can or can not see the on-sight physician.*

32) On September 29, 2015, while at Chronic Care, DR. SAMUEL BYRD prescribed a Cortisone injection for Gilman's right knee, to be administered at Procedure Clinic the following week.

33) Procedure Clinic was cancelled for two (2) months because there was only ONE (1) on-site physician, being Dr. BYRD. Gilman was left LIMPING AND IN PAIN for four (4) months, because he DID NOT get the Cortisone injection that DR BYRD prescribed on October 4, 2015. Pursuant to Dr. BYRD, he requested an Orthopedic Consult for Gilman's right knee, but CORIZON DENIED that request, by approved that Gilman be treated by the physical therapist for six (6) weeks. Pursuant to Dr. BYRD, he was also instructed by

CORIZON to try an oral pain medication, which it has already been PROVEN that ORAL PAIN MEDICATIONS DO NOT WORK on Gilman's knee.

34) On November 20, 2015, X-rays were again taken that indicated, "Well corticated FREE calcified densities are demonstrated at the anterior aspect of the tibiotalor joint." [Exhibit #9]. In LAYMAN'S terms: the x-rays showed the SAME LOOSE BODIES that were identified in approximately 2004.

In the Health Care Services Directives, Manuel of Policies and Procedures – A1.05, pg. 3 0f 4 states: [Exhibit #10, 4 pages]:

> A1.05(G) –"If a request for off-site referral is not approved and the on-site provider believes that the denial and alternate suggestions are inappropriate, the ON-SITE PROVIDER MUST ACT ON HIS/HER PATIENT'S BEHALF. Depending upon the urgency of the problem, the provider may write or telephone the contracted medical provider's regional medical director (CORIZON) or designated individual to discuss the patient. All such contracts BMUST be documented in the health record."

35) When Gilman confronted Dr. BYRD with this Policy (in #33 above) Dr. BYRD acknowledged the Policy and noted to Gilman in summation that CORIZON's word is the last word.

36) At the fifth week of physical therapy, in March 2016, Dr. BYRD stopped by the therapy area and told Gilman that he (BYRD) had re-submitted the request for MRI for approval by CORIZON, and that Gilman should get the MRI before his next Cortisone Injection wears off (meaning sometime in April or May, Gilman should receive the MRI). <u>Defendant's AMY WRIGHT, RN/B. RIGGS, RN/ C. PEARISON, MA/ KIM HOPSON, RN.</u>

37) Pursuant to defendant; Dr. BYRD Gilman is to notify him every time the cortisone injection wears off.

38) On September 8, 2015, Gilman submitted HCR 227222, stating that the Cortisone injection had worn off, thus Gilman was having sever PAIN in his right knee. Defendant C. PEARISON, MA, responded, "You will be scheduled." [Exhibit # 11].

39) On September 29, 2015, I was seen at Chronic Care by defendant, Dr. BYRD, who on that date, prescribed another CORTIZON INJECTION for PAIN CONTROL, to be scheduled to procedure clinic the 'FOLLOWING WEEK.'

40) Gilman did not receive the injection the following week so filed an Informal Complaint on October 9, 2015, Defendant AMY WRIGHT responded, "You were seen again in Chronic Care on 9/29/15. Cortisone injections are only given every 90 days per MD's discretion. You are scheduled and will be seen when PROCEDURE CLINIC RESUM'S." [Exhibit #12] Defendant, Dr. BYRD, had already prescribed the injection for the prior week, per Dr. BYRD's DISCRETION.

41) After being left in PAIN, Gilman continued the Grievance Procedure on November 13, 2015, which was not responded to until December 7, 2015.

42) On November 20, 2015, x-rays were taken of Gilman's right knee.

43) On November 29, 2015, still in PAIN, Gilman submitted HCR 225313 requesting both the x-ray results and the Cortisone injection that had been prescribed for the FIRST WEEK OF OCTOBER. [Exhibit #13]. Defendant B. RIGGS responded x-ray results will be reviewed at C.C.C. (Chronic Care which would not be until January) and made NO mention of the prescribed injection.

44) Gilman submitted HCR 225336 on December 5, 2016, LIMPING and STILL IN PAIN, asking about the Cortisone injection. [Exhibit #14]. Defendant C. PEARISON responded, "Needs injection-scheduled."

45) On December 7, 2015, the Grievance Response was made by defendant KIM HOPSON, "He plans to schedule you for injection sometime in December." [Exhibit #15]. Gilman has been LIMPING and in SEVERE PAIN since September 2015.

46) Gilman, still LIMPING and IN PAIN, submitted HCR 225379, again asking for the Cortisone injection, on January 3, 2016. Defendant B. RIGGS responded, "Scheduled w/MD." [Exhibit 16].

47) On January 7, 2016, Gilman submitted HCR 213995, still requesting the Cortisone injection. [Exhibit #17]. Gilman finally got the injection on January 8, 2016. Gilman was left LIMPING and IN EXTREME PAIN for four (4) months.

48) The Cortisone injection wore off and Gilman submitted HCR 222541 on March 6, 2016 reporting to Dr. Byrd that the shot had worn off. The response was, "Noted." [Exhibit #18].

49) On March 19, 2016, Gilman submitted HCR 225876 stating that he was in PAIN and wanted MDSC instead of Chronic Care, because Chronic Care would not be until sometime in April. Defendant B. RIGGS responded, "You are scheduled with MD." [Exhibit #19].

50) On April 3, 2016, Gilman was still LIMPING and IN EXTREME PAIN so he submitted HCR 225987. The response was, "scheduled." [Exhibit #20]

51) In April, 2016 Gilman was seen at Chronic Care, where rather than leave it to the Nursing staff, Dr. Byrd gave Gilman the Cortisone injection on the spot.

52) Dr. Byrd re-submitted a request to CORIZON for an MRI to be done on Gilman's right knee. (awaiting a response)

THE NURSING STAFF LEFT GILMAN LIMPING AND IN EXTREME PAIN

FROM SEPTEMBER 2015 UNTIL JANUARY 2016, AFTER DR. BYRD ORDERED THE CORTISONE INJECTION FOR THE FIRST WEEK OF OCTOBER. THE ONLY OTHER SENARIO WOULD BE DR. BYRD DID NOT ORDER THE INJECTION AND IT WAS HIM THAT LEFT GILMAN LIMPING AND IN PAIN.

GILMAN WAS LEFT LIMPING AND IN PAIN FOR THE MONTH OF MARCH WHEN THEY DENIED GILMAN ACCESS TO MD SICK-CALL BY MAKING GILMAN WAIT UNTIL CHRONIC CARE CLINIC WHEN GILMAN SPECIFICALLY REQUESTED MD SICK-CALL.

## VI. RELIEF

State exactly what relief or action you are requesting through this lawsuit.

I. **COMPENSATORY DAMAGES** in the form of Ten Thousand Dollars, (10,000.00) PER Defendant, for a total of ~~Eighty Thousand ($80,000.00)~~ One Hundred Twenty Thousand Dollars;

II. **PUNATIVE DAMAGES** in the form of Twenty Thousand Dollars, ($20,000.00) PER Defendant, for a total of ~~One~~ Two Hundred and ~~Sixty~~ Forty Thousand Dollars, ~~($160,000.00)~~ ($240,000.00)

III. **MEDICAL ORDER** to IDOC to present the Plaintiff to the Orthopedic Specialist at the IDOC's Contracted Facility at Terre Haute Regional Hospital to correct the underlining problem that is causing UNDUE PAIN AND SUFFERING in the Plaintiff's right knee.

### AFFIRMATION OF PLAINTIFF

I, James Gilman, the Plaintiff in the aforementioned Cause, do hereby affirm on this ~~May 26~~ June, 2016, that I have read all of the statements contained in this Complaint and that I believe them to be true and correct to the best of my personal knowledge and belief.

James Gilman / Plaintiff pro-se