UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JAMES E. GILMAN,                              )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )        No. 2:16-cv-00194-JRS-MJD
                                             )
CORIZON MEDICAL SERVICES, et al.             )
                                             )
                    Defendants.              )

**Order Granting Motion for Summary Judgment
And Directing Entry of Final Judgment**

Plaintiff James Gilman, an inmate at the Wabash Valley Correctional Facility ("Wabash"),

brings this action pursuant to 42 U.S.C. § 1983 alleging that his Eighth Amendment rights have

been violated because he received inadequate medical care for his knee pain while incarcerated.

The defendants have moved for summary judgment and Mr. Gilman has responded. For the

following reasons, the motion for summary judgment is **granted**.

**I. Summary Judgment Standard**

Summary judgment is appropriate when the movant shows that there is no genuine dispute

as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R.

Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v.

Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there

is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To survive a motion for summary judgment, the non-moving party must set forth specific,

admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## II. Factual Background

The following statement of facts has been evaluated pursuant to the standard set forth above. Some of the facts that follow are disputed. The Court notes these disputes, but whether noted or not, the facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Gilman, "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

A. *The Parties*

Since his incarceration, Mr. Gilman has experienced chronic osteoarthritis of his knees, hands, and feet. Dkt. 160-1, ¶ 7.

During the times relevant to Mr. Gilman's complaint, Defendant Corizon, LLC was the company that contracted with the Indiana Department of Correction ("IDOC") to provide medical care to Indiana prisoners. Dkt. 2.

Defendant Dr. Samuel Byrd was a physician providing medical services at Wabash during all times relevant to the complaint. Dkt. 160-1, ¶ 3. As a physician, Dr. Byrd saw inmates as they were scheduled by nursing staff. *Id*. Dr. Byrd asserts that he did not set the patient schedule. *Id*. Dr. Byrd treated Mr. Gilman for his arthritis at all relevant times. *Id*., ¶ 4.

Defendant Dr. Michael Mitcheff was the Regional Medical Director for Corizon, LLC from 2006 to July 4, 2014. Dkt. 160-2, ¶ 4. Defendant Dr. Brian Buller was the Associate Regional Medical Director for Corizon from May 4, 2015, to April 2016. Dkt. 160-3, ¶ 4. As Corizon Regional Medical Directors, Dr. Mitcheff and Dr. Buller's duties and responsibilities included reviewing consultation requests from providers at prisons to refer inmates for outside specialty appointments, including surgeries, diagnostic imaging, or consultations with specialists. Dkt. 160-2 ¶ 5; dkt. 160-3, ¶ 5. Dr. Mitcheff and Dr. Buller would review these requests and either communicate their agreement or suggest an alternative treatment plan. *Id*. If either Dr. Mitcheff or Dr. Buller suggested an alternative treatment plan, the provider at the prison had the final authority to proceed with the requested course of treatment or agree with the alternative treatment plans offered. *Id*. Almost every time that Dr. Mitcheff, Dr. Buller, or other Corizon executives submitted an alternative treatment plan, the provider at the prison followed their recommendation. *See* Dkt. 181-2, pp. 331-334, 335-37.

Defendant Chelsey Pearison was a qualified medical assistant ("QMA") at Wabash at all relevant times. Dkt. 160-4, ¶ 4. QMA Pearison cannot diagnose medical conditions or prescribe medications. *Id*., ¶ 5. Part of QMA Pearison's duties and responsibilities as a medical assistant included coordinating with the onsite medical provider, in this case Dr. Byrd, to schedule provider appointments. *Id*.

Defendants Nurse Barbara Riggs, Nurse Amy Wright, and Nurse Kimberly Hobson were licensed and qualified nurses at Wabash during all relevant times. Dkt. 160-5, ¶ 4; dkt. 160-6, ¶ 4; dkt.160-7, ¶ 4. Nursing staff cannot diagnose medical conditions or order medical treatment for offenders or any other patients. Dkt. 160-5, ¶ 5; dkt. 160-6, ¶ 5; dkt. 160-7, ¶ 5. Nursing and

assistant staff also cannot prescribe medications. *Id.* Nursing staff does not schedule provider appointments. Dkt. 160-5, ¶ 7; dkt. 160-6, ¶ 7; dkt. 160-7, ¶ 5.

At Wabash, inmates fill out a Healthcare Request Form ("HCR"), which describes who the inmate needs to see and the medical need the inmate is having.[1] Dkt. 181-1, ¶ 6. The inmate places the HCR in a box in their housing unit. *Id.* A nurse is supposed to pick up HCRs daily, but the nurse sometimes skips pickups on the weekends. *Id.* The nurse reviews the HCR and either conducts a visit with the inmate or issues a written response. *Id.* During a visit, the nurse will determine if the inmate should see a provider/doctor. *Id.* In response to an HCR, nurses would tell Mr. Gilman that he was already scheduled to see a provider during a regularly scheduled chronic care visit – visits that are scheduled every six months. *Id.*, ¶ 7.

B. *Gilman's History of Knee Arthritis*

Mr. Gilman has a history of arthritis in his knees, hands, and feet. Dkt. 160-1, ¶ 5. Mr. Gilman previously filed a lawsuit regarding arthritis in his knees. *Gilman v. Correctional Medical Services,*[2] *et al.*, No. 2:07-cv-00161. The parties agree that the medical treatment that was at issue in that case is not at issue in this case. The parties further agree that Mr. Gilman's claims in this case are his claims that the defendants exhibited deliberate indifference to his serious medical needs between June 2014 and June 2016. Dkt. 180, p. 4.

---

[1] The defendants object to Mr. Gilman's description of these medical policies and procedures for lack of foundation. But it is evident from the record that Mr. Gilman regularly used the HCR process during the times relevant to this case. He certainly has knowledge of how an inmate requests medical care and can testify to his experiences on this point.

[2] Correctional Medical Services later became Corizon Health, LLC, one of the defendants in this case.

Dating back to at least 2012, Mr. Gilman's medical records note that conservative measures, including prescription medications, had failed.[3] Dkt. 181-2, pp. 215-217 (discussing pain in both knees). Mr. Gilman was prescribed Mobic, a Nonsteroidal Anti-inflammatory Drug ("NSAID") for his pain. Dkt. 160-9, p. 175. By July 5, 2013, Mr. Gilman had taken so many NSAIDs that Dr. Naveen Rajoli advised he should avoid using NSAIDs altogether "because of the long-term side effects." Dkt. 181-2, pp. 242-245. In 2013, when Mr. Gilman had an orthopedic consult, Dr. Madsen, an orthopedic specialist, diagnosed him with "degenerative joint disease severe erosive bilateral, left worse than right." *Id.*, p. 167. During this consultation, Mr. Gilman states that Dr. Madsen told him that while both knees needed to be replaced, he had to choose one. Dkt. 181-1, ¶ 31. Mr. Gilman had a total replacement of his left knee on February 18, 2013. Dkt. 160-9, p. 173.

C. *Treatment of Mr. Gilman's Right Knee Arthritis from 2014-2016*

From June 2013 through July 2014, Mr. Gilman submitted various HCRs requesting Mobic refills for his arthritis. Dkt. 160-9, pp. 177, 194-195; Dkt. 160-10, pp. 11-12, 25. On June 11, 2014, Mr. Gilman saw Dr. Rajoli and reported right knee pain that had been ongoing since he arrived at the IDOC. Dkt. 160-10, pp. 13-16. A physical exam was normal and revealed no tenderness or swelling. *Id*. Mr. Gilman was wearing a knee brace. *Id*. Dr. Rajoli reviewed Mr. Gilman's history and saw that he had previously received a short course of Prednisone (an oral steroid for arthritis) with success. *Id*. Dr. Rajoli ordered Prednisone, cortisone injections, and x-rays. *Id*.

---

[3] The defendants object to testimony regarding the treatment Mr. Gilman received before 2014 as irrelevant because it is outside the applicable statute of limitations. But, while the treatment he received before 2014 is not part of the claims in this case, it is relevant to the length of time he was experiencing right knee pain and what measures to treat that pain had already been tried.

On July 9, 2014, Mr. Gilman's x-ray revealed moderate to severe arthritis with some swelling and no acute injury. *Id*., p. 17. That same day, Mr. Gilman requested his Prednisone prescription be refilled and medical staff told him he had a prescription through September 2014. *See id*., pp. 18-24.

On August 1, 2014, Mr. Gilman saw Dr. Neil Martin and was concerned because "he was promised a knee injection." Dkt. 160-10, pp. 26-28. A physical exam revealed a stable right knee, although Mr. Gilman reported pain on movement. *Id*. Dr. Martin ordered a cortisone injection for Mr. Gilman's arthritis pain. *Id*. On August 8, 2014, Mr. Gilman received the cortisone injection. *Id*., pp. 29-31. On August 27, 2014, Dr. Martin charted that Mr. Gilman had some arthritic flare-ups in his right knee, but was otherwise asymptomatic. *Id*., pp. 32-33. Mr. Gilman's physical exams were normal and he was able to ambulate. *Id*. He was also active at recreation and performed physical activities without limitations. *Id*.

On September 14, 2014, Mr. Gilman submitted an HCR asking to see a doctor for his arthritis pain. Dkt. 181-2, p. 278. Nurse Riggs referred him to the doctor. *Id*.

On September 18, 2014, Nurse Riggs noted that Mr. Gilman's "condition was not responding to protocols." Dkt. 181-1, ¶ 39; dkt. 181-2, p. 280.

On September 24, 2014, Mr. Gilman saw Dr. Rajoli for his arthritis. Dkt. 160-10, pp. 34-36. Dr. Rajoli inquired into Mr. Gilman's daily living activities and functions. *Id*. The parties dispute whether Mr. Gilman told the provider that he could complete certain daily living activities. The evidence in the light most favorable to Mr. Gilman is that he did not tell Dr. Rajoli that he could climb stairs, cook, get into or out of the bathtub, or get in and out of a car. Dkt. 181-1 ¶ 38. Dr. Rajoli diagnosed him with mild right knee arthritis that occurred intermittently. *Id*. Mr. Gilman

told Dr. Rajoli that his arthritis was relieved with medications, heat, and Prednisone. *Id*. Dr. Rajoli ordered Prednisone through January 2015. *Id.*, pp. 37-44.

On December 9, 2014, Mr. Gilman saw medical staff for his annual health assessment. Dkt. 160-10, pp. 44-45. Mr. Gilman did not report any concerns with his arthritis or any limitations in his daily living activities or ambulation. *Id*. He was classified as free of disability or limitations. *Id*. On December 15, 2014, Dr. Michael Aluker ordered nursing staff to lower his Prednisone prescription and dosage to wean him off the steroid. *Id.*, pp. 47-48.

On January 14, 2015, Mr. Gilman requested a refill of his Prednisone. Dkt. 160-10, p. 49. This was the first time defendant Dr. Byrd treated Mr. Gilman. Dkt. 160-1, ¶ 10. Prednisone is a corticosteroid aimed at reducing inflammation in the joints. *Id*. Since Mr. Gilman reported relief with Prednisone, Dr. Byrd refilled his prescription through July 15, 2015. Dkt. 160-10, pp. 50-59.

On February 4, 2015, Dr. Byrd examined Mr. Gilman for his right knee arthritis. *Id.*, pp. 60-63. Mr. Gilman reported that he had been getting cortisone injections for some time until the staff physicians changed. *Id*. Mr. Gilman stated that no one else would give him injections. *Id*. He reported that anti-inflammatory medications did not provide him with relief. *Id*. He also wore a knee brace and reported modest relief from the brace. *Id*. Mr. Gilman reported swelling if "I do much." *Id*. He requested a right knee cortisone injection. *Id*. Dr. Byrd's physical exam was normal and there was no swelling or weakness in Mr. Gilman's right knee, although Mr. Gilman did report pain. *Id*. Dr. Byrd gave Mr. Gilman a cortisone injection and ordered him to return for a follow up in three months. *Id*. Dr. Byrd also ordered replacement bilateral knee braces. *Id*. On February 26, 2015, Mr. Gilman received his knee braces. *Id.*, pp. 64-66.

On April 8, 2015, Mr. Gilman submitted an HCR requesting a cortisone injection for his right knee and reporting that he believed he was on a ninety-day cycle for his injections. Dkt. 160-

10, p. 67. QMA Pearison responded that Mr. Gilman was scheduled to see a provider in the Chronic Care Clinic. *Id.* On April 15, 2015, Dr. Byrd examined Mr. Gilman in the Chronic Care Clinic for his right knee arthritis. *Id.*, pp. 68-72. Mr. Gilman told Dr. Byrd that the last injection provided him with relief for two months and requested another injection. *Id.* Mr. Gilman also complained of left knee pain and was concerned about damaged hardware from his prior surgery. *Id.* Dr. Byrd ordered a cortisone injection in Mr. Gilman's right knee and a left knee x-ray. *Id.* On April 24, 2015, Mr. Gilman received a cortisone injection. *Id.*, pp. 73-75.

On April 27, 2015, Dr. Byrd examined Mr. Gilman in Chronic Care Clinic and Mr. Gilman reported that the cortisone injection "took." *Id.*, pp. 76-79. Dr. Byrd ordered labs to monitor Mr. Gilman's medical condition since he had a long-standing Prednisone prescription for arthritis. *Id.*

On June 29, 2015, Mr. Gilman filed an HCR requesting another right knee injection. *Id.*, p. 80. Nurse Riggs responded that Mr. Gilman was scheduled for a Chronic Care Clinic visit. *Id.* On July 8, 2015, Dr. Byrd saw Mr. Gilman in Chronic Care for his right knee arthritis pain. *Id.*, pp. 81-95. Mr. Gilman's left-knee x-rays revealed arthritis and intact hardware. *Id.* Dr. Byrd ordered a cortisone injection, prescribed the pain medication Imipramine through January 12, 2016, and prescribed Prednisone through January 4, 2016. *Id.* On July 17, 2015, Dr. Byrd administered a right knee cortisone injection. *Id.*, pp. 96-97.

On September 8, 2015, Mr. Gilman submitted an HCR reporting that his cortisone injection had worn off. *Id.*, p. 98; Dkt. 160-4, ¶ 7. QMA Pearison reviewed Mr. Gilman's records and confirmed that his last cortisone injection was in July 2015. *Id.* She scheduled an appointment for Mr. Gilman to see a provider and responded to the HCR by notifying him that he was scheduled for a visit with a provider. Dkt. 160-10, p. 98.

On October 2, 2015, Dr. Byrd saw Mr. Gilman in a Chronic Care Clinic visit and Mr. Gilman requested another cortisone injection. Dkt. 160-1, ¶ 17; dkt. 160-10, pp. 99-103. Mr. Gilman also reported that the orthopedic physician who completed his left knee total replacement surgery (Dr. Madsen) told him he would require a right knee total replacement as well. *Id*. Dr. Byrd noted that Mr. Gilman did not experience relief with NSAIDs. Dkt. 160-10, p. 99. Mr. Gilman did not have any acute injury or ligament damage, although he did report pain on movement which is not uncommon in patients with arthritis. *Id.* Dr. Byrd ordered a cortisone injection "when possible" and a follow-up x-ray to further evaluate Mr. Gilman's right knee and determine if additional intervention was indicated. *Id.* The records indicate that the x-ray was ordered on November 18, 2015. *Id.*, p. 103.

After this appointment, Dr. Byrd began investigating Mr. Gilman's statement that Dr. Madsen stated he would need a right total knee replacement. Dkt. 160-1, ¶ 19. Dr. Byrd took steps to obtain and review Mr. Gilman's medical records to determine what occurred at the time of his 2013 left knee replacement. *Id.* Dr. Byrd states that if he had found information corroborating Mr. Gilman's recollection that Dr. Madsen had recommended total right knee replacement surgery, Dr. Byrd would have simply referred him for the surgery. *Id.* Dr. Byrd also explains that deferring corticosteroid injections into a knee that may require surgery is medically preferable. *Id.* However, Dr. Byrd did not find a prior recommendation for total right knee replacement. *Id.* Dr. Byrd testifies that his investigation into Mr. Gilman's assertion that Dr. Madsen recommended total right knee replacement caused the delay in scheduling the cortisone injection. *Id.* Once Dr. Byrd was satisfied that Dr. Madsen had not recommended total right knee replacement, he scheduled Mr. Gilman for a right knee injection. *Id.* Mr. Gilman states that Dr. Byrd told him that he did not know when his injection would be scheduled because he was the only doctor at Wabash. Dkt. 181-1, ¶ 46. Mr.

Gilman also talked to QMA Pearison after this visit.[4] *Id.* She told him that his injection would be administered at the Procedure Clinic, but the clinic was canceled until another doctor was hired or assigned to Wabash. *Id.* ¶ 46. Mr. Gilman describes the pain he was experiencing at this time as a 9 on a scale of 1-10. *Id.*

On October 5, 2015, Mr. Gilman filed an informal grievance complaining that he had not received a cortisone injection following his visit with Dr. Byrd. Dkt. 160-6, ¶ 7; dkt. 160-10, p. 180. Nurse Wright responded that he had received an injection on July 17, 2015, and that injections are given only every 90 days at the discretion of the provider. *Id.* She also told him that he would be seen when the Procedure Clinic resumes. *Id.*

On November 13, 2015, Mr. Gilman filed a formal grievance again complaining that he had not received his cortisone injection. Dkt. 160-7, ¶ 7; dkt. 160-10, p. 182-83. Nurse Hobson responded to this grievance on November 18, 2015, and told Mr. Gilman that Dr. Byrd had ordered an x-ray and that he would be scheduled for an injection sometime in December. Dkt. 160-10, p. 193.

On November 22, 2015, Mr. Gilman's right knee x-ray was performed. *Id.* p. 104. It revealed moderate arthritis and no acute injury. *Id.* p. 104.

On November 29, 2015, Mr. Gilman submitted an HCR asking for the results of his x-ray and a cortisone injection. Dkt. 160-4, ¶ 7; dkt. 160-10, p. 105. Nurse Riggs responded that the results of the x-ray would be reviewed at Chronic Care Clinic. *Id.*

---

[4] The defendants object to some of Mr. Gilman's testimony regarding alleged staffing issues as containing legal conclusions and argument, but what Dr. Byrd and Ms. Pearison told Mr. Gilman is a statement of fact and he can testify as to what Dr. Byrd and Ms. Pearison told him as a statement by a party opponent. Fed. R. Evid. 801(d)(2).

On December 5, 2015, Mr. Gilman submitted another HCR requesting a cortisone injection and stating that medical staff told him that the procedure was delayed because there was not a second physician on staff. Dkt. 160-4, ¶ 8; dkt. 160-10, p. 106. QMA Pearison reviewed Mr. Gilman's medical history and coordinated with Dr. Byrd to schedule an appointment. Dkt. 160-4, ¶ 8.

On December 18, 2015, Dr. Byrd renewed Mr. Gilman's oral Prednisone prescription through June 18, 2016. Dkt. 160-10, p. 109-118.

On January 3, 2016, Mr. Gilman submitted another HCR stating that he had not received his cortisone injection and had experienced arthritis pain since October 2015. Dkt. 160-10, p. 119. Nurse Riggs reviewed Mr. Gilman's records and responded that he was scheduled for an injection. Dkt. 160-5, ¶ 9. dkt. 160-10, p. 119.

On January 7, 2016, Mr. Gilman submitted another HCR requesting to know when his appointment was for the cortisone injection. Dkt. 160-10, p. 122. Nurse Riggs responded that his appointment was set for January 8, 2016. *Id.*

On January 8, 2016, Mr. Gilman received a cortisone injection in his right knee. *Id.*, p. 123. On January 14, 2016, Dr. Byrd saw Mr. Gilman in Chronic Care Clinic for his right knee arthritis. Dkt. 160-1, ¶ 20; dkt. 160-10, pp. 125-28. Mr. Gilman told Dr. Byrd that his cortisone injections typically relieved his pain for up to two months at a time and that he was concerned that they were not particularly safe. Dkt. 160-10, pp. 125-28. He again told Dr. Byrd that Dr. Madsen had recommended a right total knee replacement in 2013. *Id.* Dr. Byrd noted that he had reviewed Mr. Gilman's records and did not find an order or recommendation for a right knee total replacement surgery. *Id.* Dr. Byrd also noted that he reviewed Mr. Gilman's 2009 MRI and noted a potential torn left ACL, but Mr. Gilman did not know what had happened and simply began having

instability of the knee before it was replaced. *Id.* Mr. Gilman now reported getting similar episodes of instability with the right knee and had fallen before getting a cane at the time of his last injection. *Id.* He also reported using the elevator to get to the classes he taught because he did not feel safe using the stairs. *Id.* Dr. Byrd's physical exam revealed a positive meniscus test and a significant decrease in range of motion in Mr. Gilman's right knee. *Id.* Dr. Byrd ordered physical therapy for Mr. Gilman's right knee and recommended an orthopedic consult. *Id.*

As noted above, when a provider in a prison wants to refer an inmate outside of the prison for specialty appointments, they submit a Consultation Request Form that would then be reviewed to see if the request meets certain criteria. Dkt. 160-1, ¶ 21. The Regional Medical Director or Associate Regional Medical Director reviews these requests and either agrees with the recommendation or suggests an alternative treatment plan. *Id.*

On January 27, 2016, the Regional Director at that time, Dr. Papendick, reviewed Dr. Byrd's orthopedic consult recommendation. Dkt. 160-1, ¶ 22; dkt. 160-10, pp. 129-130. Dr. Papendick recommended an alternative treatment plan that included physical therapy, rotating anti-inflammatory medications and cortisone injections. *Id.* Dr. Papendick indicated that Mr. Gilman was still ambulatory with an aide and had not failed conservative therapies. *Id.* Mr. Gilman contends that conservative measures had not been useful in treating his pain since at least 2012. Dkt. 181-2, pp. 215-217. Dr. Byrd agreed with the alternative plan and ordered physical therapy for Mr. Gilman's right knee. Dkt. 160-1, ¶ 22; dkt. 160-10, pp. 129-130. Dr. Byrd determined that it would not hurt to strengthen Mr. Gilman's right lower extremity before any potential surgical interventions. *Id.* Dr. Byrd determined that the use of Mr. Gilman's cane could have led to some degree of weakness in his quadriceps and could be contributing to his knee instability. *Id.*

From February 10, 2016, through March 14, 2016, Mr. Gilman underwent physical therapy for his right knee arthritis. Dkt. 160-10, pp. 134-138, 140. On March 19, 2016, Mr. Gilman submitted an HCR notifying medical staff that his last cortisone injection had worn off. Dkt. 160-5, ¶ 10; Dkt. 160-10, p. 139. Nurse Riggs reviewed Mr. Gilman's medical records and responded that he had been scheduled with the doctor. *Id*. On April 4, 2016, Mr. Gilman filed another HCR stating that he had not yet received his cortisone injection and did not want to be scheduled for chronic care. Dkt. 160-10, p. 141. Mr. Gilman requested a visit with medical sick call. *Id*. Medical staff responded that Mr. Gilman was scheduled to see a provider. *Id*. On April 8, 2016, Dr. Byrd examined Mr. Gilman in chronic care for his right knee arthritis. Dkt. 160-1, ¶ 23; dkt. 160-10, pp. 142-145. Dr. Byrd noted that Mr. Gilman completed on-site physical therapy and plateaued with essentially no improvement. *Id*. Dr. Byrd's physical exam revealed limited range of motion and a small suprapatellar effusion. *Id*. Dr. Byrd opined that it was time for intervention beyond conservative measures for Mr. Gilman's right knee, with cortisone shots only lasting a couple of months and no relief from anti-inflammatory medications. *Id*. Dr. Byrd performed a right knee injection and ordered an MRI. *Id*. On April 8, 2016, medical providers, including Dr. Byrd, prescribed Mr. Gilman Prednisone through July 2016. *Id*., pp. 146.

On May 11, 2016, Dr. Byrd examined Mr. Gilman in a Chronic Care Clinic visit. Dkt. 160-10, pp. 147-149. Mr. Gilman reported severe arthritis in his right knee that was worsening. *Id*. Mr. Gilman explained that he experienced activity limitation, joint swelling of knees, limping, morning stiffness and weakness. *Id.* He also told Dr. Byrd that Prednisone no longer helped his knees, although it helped his hand arthritis, and the cortisone injections helped for up to two months. *Id*. Dr. Byrd determined that Mr. Gilman had failed conservative therapies and that he would continue

to monitor Mr. Gilman's progress with a potential MRI in the future to evaluate the need for further interventions. *Id.*

Dr. Byrd then submitted Consultation Request Forms for an MRI and orthopedic consultation. Dkt. 160-3, ¶ 10; dkt. 160-10, pp. 150-53. Dr. Byrd stated that Mr. Gilman had "been on NSAIDs with no relief. He wears a knee brace as well with only modest relief. … He is walking with a cane and falls despite cane…. He notes it is most difficult to descend stairs. PT ON SITE DONE AND HE HAS PLATEAUED WITH ESSENTIALLY NO IMPROVEMENT… significant decrease in ROM." Dkt. 160-10, p. 151. Associate Regional Medical Director, Dr. Brian Buller, reviewed Dr. Byrd's requests and requested additional information to justify pursuing more invasive treatment. Dkt. 160-3, ¶ 10. Dr. Buller requested documentation of the specific MRI exam Dr. Byrd requested because there were varying types of MRIs. *Id.* Dr. Buller explained that not all MRIs are alike, and he has seen the wrong MRI ordered by practitioners. *Id.* Dr. Buller recommended that an orthopedic specialist determine exactly what kind of MRI would be appropriate so that the correct information would be available to make the appropriate assessment and treatment plan. *Id.* Further, Dr. Buller requested additional information on what had been tried as far as PT, exercise, medication and how Mr. Gilman was functioning in the facility, including his reported falls. *Id.* Dr. Buller states that this information was required in the managed care environment to establish that all other alternatives were exhausted, and Mr. Gilman would be going toward a joint replacement, which begins with an orthopedic consultation. *Id.* Dr. Buller explains that joint replacement is not a benign procedure and there are lots of risks and complications and those who are not very compliant may have low success rates. *Id.* Dr. Buller requested the additional information and documentation to demonstrate that Mr. Gilman would be a good candidate for an orthopedic consultation and joint replacement surgery. *Id.*

On August 24, 2016, Dr. Byrd submitted another orthopedic request with the requested information. Dkt. 160-3, ¶ 11; dkt. 160-10, pp. 161-64. Dr. Byrd described the physical therapy Mr. Gilman had received, stated that he used the elevator to go up one flight of stairs, did not do any physical activities at recreation, reported falls, did not engage in physical activity, and used a cane to ambulate. *Id*. Mr. Gilman had failed treatment with anti-inflammatories and had an ongoing prescription for Prednisone. *Id*. Given this information, Dr. Buller agreed that Mr. Gilman should now be considered for joint replacement because the information and documentation supported that he had exhausted all conservative alternatives, although Dr. Buller remained hesitant given Mr. Gilman's relatively young age for joint replacement surgery. *Id*.

On October 3, 2016, Mr. Gilman went off-site to orthopedic surgeon Dr. Madsen who diagnosed him with degenerative joint disease. Dkt. 160-10, p. 168. Dr. Madsen charted, based on Dr. Byrd's detailed and inclusive orthopedic consultation request, that Mr. Gilman had failed all conservative therapies and recommended a right total knee replacement. *Id*. Dr. Madsen noted that the bones in Mr. Gilman's right knee were rubbing together. Dkt. 181-2, p. 387. On November 2, 2016, Mr. Gilman underwent a right total knee replacement without complication. *Id*., p. 169.

D. *Expert Opinions*

The defendants have presented the opinions of two doctors who have reviewed Mr. Gilman's medical records regarding the care he received that is at issue in this case.

Dr. Casey Pickerill is a Board-Certified Family Practice physician appointed by the Court as an independent expert pursuant to Rule 706 of the Federal Rules of Evidence. Dr. Pickerill reviewed Mr. Gilman's medical records and provided the following opinion:

> An understood dictum in the practice of medicine is to attempt conservative, less invasive diagnostic and/or therapeutic maneuvers first, before going on to more invasive modalities, when indicated. There are times, of course, when the acuity of the situation warrants deviation from this protocol if delay caused by a prolonged

multistep algorithm could compromise the outcome (like appendectomy in the case of appendicitis.) On the other hand, chronic disease states such as degenerative joint disease, like in Mr. James Gilman's case, usually are better approached in a step-wise fashion. The standard of care actually demands that conservative therapy should be employed exhaustively when osteoarthritis is diagnosed at a young age.

Dkt. 160-11, p. 4.

Dr. Pickerill concludes "that the standard of care was met by the Corizon Health team of physicians and nurses managing Mr. James Gilman's bilateral knee arthritis." *Id.*, p. 5.

The defendants also submit the expert testimony of Dr. William Kleckner. Like Dr. Pickerill, Dr. Kleckner states that in patients with osteoarthritis, the appropriate and timely course of care involves conservative treatment before surgical intervention. Dkt. 160-8, ¶ 13. The proper treatment includes anti-inflammatory medications, therapy, activity modification, and ambulation aides. *Id*. Only after these treatments fail, and if the patient continues to complain of pain, would a surgical consult be considered. *Id*. Dr. Kleckner also opined that the defendants properly managed Mr. Gilman's cortisone injections. Dkt. 160-8, ¶ 18. The standard timeframe between administering a cortisone injection is three to six months due to risks of the procedure and potential side effects of steroidal medications. *Id*. Mr. Gilman never went longer than six months without a corticosteroid injection in his right knee from 2014 through 2016. *Id*. Dr. Kleckner also concludes that osteoarthritis in his knees did not substantially change during the defendants' care. *Id.*, ¶ 19. Dr. Kleckner opines that any delay in referring Mr. Gilman for a surgical consult was not medically significant because Mr. Gilman already had severe osteoarthritis that was not made worse by any delay in surgical intervention. *Id*.

### III. Discussion

The defendants move for summary judgment on Mr. Gilman's claims arguing that they were not deliberately indifferent to his serious medical needs.

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or *unnecessarily prolonged his pain*," and "even brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (a jury might find deliberate indifference in a delay in treating muscle spasms for approximately an hour and a half) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015)) (emphasis in *Lewis*).

For purposes of summary judgment, the parties do not dispute that Mr. Gilman's knee condition constitutes a serious medical condition. Instead, they disagree as to whether the defendants were deliberately indifferent to Mr. Gilman's knee pain. The defendants argue that they

each acted appropriately and within the standard of care when treating Mr. Gilman's knee pain. The treatment each of the defendants provided to Mr. Gilman will be discussed in turn.

A. *Expert Testimony*

First, the Court addresses Mr. Gilman's objections to the expert testimony by Dr. Kleckner and Dr. Pickerill. Rule 702 of the *Federal Rules of Evidence* governs testimony by expert witnesses. That Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 589 (1993).

Mr. Gilman objects to Dr. Kleckner's qualifications as an expert in this case, arguing that he does not have experience, training, or education related to caring for patients with specific orthopedic needs. But the issue in this case is whether Mr. Gilman's doctors, who are primary care providers, responded appropriately to his complaints of knee arthritis. Dr. Kleckner is Board Certified in Family Medicine. Dkt. 160-8, ¶ 2. An expert may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Because Dr. Kleckner has knowledge and experience providing primary care, he can testify regarding his assessment of the care Mr. Gilman received. Mr. Gilman also objects to Dr. Kleckner's affidavit, arguing that Dr. Kleckner ignored critical data in reaching his conclusion, but the record does not support this assertion. Dr. Kleckner

testifies that he reviewed Mr. Gilman's medical records, dkt. 160-8, ¶ 3, and there is no reason to believe that he did not review all of them. Dr. Kleckner has thus provided enough information regarding the facts and evidence upon which his opinions are based.

Mr. Gilman challenges Dr. Pickerill's opinion, arguing that Dr. Pickerill failed to include or consider many of Mr. Gilman's medical records. But the parties produced together the records Dr. Pickerill would review. Dkt. 131, 140. There is no evidence to suggest that Dr. Pickerill did not consider the entirety of those records. Further, to the extent that Mr. Gilman contends there are inconsistencies in Dr. Pickerill's report, Mr. Gilman questioned Dr. Pickerill on these concerns and Dr. Pickerill concluded that his overall opinion did not change. Dkt. 160-12.

In short, the experts satisfy the requirements of Rule 702 and their testimony will not be excluded.

The Court now turns to the care each of the defendants provided to Mr. Gilman.

B. *Dr. Mitcheff*

In response to the motion for summary judgment, Mr. Gilman agreed that his claims are based on care he received between June 2, 2014, and June 2, 2016. It is undisputed that Dr. Mitcheff did not provide Mr. Gilman with medical care during this time frame. He is therefore entitled to summary judgment.

C. *Dr. Byrd*

Dr. Byrd seeks summary judgment arguing that he was not deliberately indifferent to Mr. Gilman's knee arthritis.

When Dr. Byrd saw Mr. Gilman between February 4, 2015, and July 17, 2015, he either provided a steroid injection for Mr. Gilman's pain or scheduled one. *See* Dkt. 160-10, pp. 49, 60-63, 64-6673-75, 76-79, 99-105, 109-118, 123. In that time period, those shots were not more than

three months apart. Dr. Byrd also prescribed other pain medicines and ordered labs to monitor Mr. Gilman's condition because of the medications he was taking. *See id.* While Mr. Gilman reported that steroid injections provided pain relief for only about two months, the defendants have presented expert testimony that a time span of three to six months between cortisone injections in treating arthritis is normal and appropriate due to the risks of the procedure and potential side effects of the steroid medications. While there was one period in which there was nearly six months between injections, both experts have testified that such a time frame is within the standard of care for treating this chronic condition. There was no time in which Mr. Gilman went longer than six months between injections.

Further, there is no evidence to support a conclusion that Dr. Byrd persisted in a course of treatment he knew was not working. Dr. Byrd consistently provided cortisone injections when Mr. Gilman requested them and prescribed other pain medications. Dkt. 160-10, pp. 125-28. When Dr. Byrd thought it might be time to consider knee surgery, he requested an orthopedic consultation for Mr. Gilman. Based on the advice of the Regional Medical Directors in response to those requests, he sent Mr. Gilman to physical therapy and tried other conservative measures to treat his condition. *See* Dkt. 160-10, pp. 129-30. The defendants have also presented expert testimony that such a conservative course of treatment is appropriate, particularly when someone is diagnosed with osteoarthritis at a young age, like Mr. Gilman, who was in his forties when his arthritis was diagnosed. Finally, there is no evidence that any delay in providing Mr. Gilman with replacement surgery for his right knee aggravated his condition.

In short, there is no evidence that would allow a reasonable jury to conclude that Dr. Byrd was deliberately indifferent to Mr. Gilman's condition. Dr. Byrd is therefore entitled to summary judgment on Mr. Gilman's claims.

C. *Dr. Buller*

Next, Dr. Buller argues that he was not deliberately indifferent to Mr. Gilman's knee pain because he reviewed Dr. Byrd's consultation requests and suggested that Dr. Byrd gather additional information and documentation to justify surgical intervention.

Dr. Byrd requested an orthopedic consultation for Mr. Gilman on January 14, 2016. Dkt. 160-10, p. 125-27. He noted that he "is steroid dependent" and "has failed PT for this previously." *Id.*, p. 127. That consultation request was denied by another doctor. Dr. Byrd then requested an MRI and an orthopedic consultation for Mr. Gilman on May 16, 2016. Dkt. 160-10, p. 150-157. In that request, Dr. Byrd stated that Mr. Gilman had reported falling, that cortisone injections had only provided about two months' relief, that physical therapy had plateaued with essentially no improvement, and that Mr. Gilman had experienced decreased range of movement. Dkt. 160-10, pg. 151. Dr. Buller inquired whether MRI is the imaging of choice, if Dr. Byrd saw him after the falls, how others report he is doing, and suggested submitting for an orthopedic consult. Dkt. 160-10, p. 153. A request for an orthopedic consultation was submitted on July 12, 2016, which contained essentially the same information as the previous request for an MRI. Dkt. 181-2, p. 363. The response to that request was deferred. Dr. Buller inquired whether Mr. Gilman had done exercises for strengthening and to "consider scheduling and restricting NSAIDS and acetaminophen to demonstrate compliance . . . ." Dkt. 160-10, p. 157. Dr. Buller states that this information is required to establish that all other alternatives were exhausted. Dkt. 160-3, ¶ 10. Mr. Gilman saw the orthopedic specialist on October 3, 2016. Dkt. 160-10, p. 168. Dr. Madsen recommended a total knee replacement and that surgery was performed on November 2, 2016. *Id.* p. 169.

Again, the defendants have presented expert testimony that conservative measures are appropriate for knee arthritis before moving on to surgery because of the risks and complications related to knee replacement surgery. Given this, and considering Dr. Buller's detailed responses to the requests he received, there is no evidence to allow a reasonable jury to conclude that Dr. Buller was deliberately indifferent to Mr. Gilman's condition. He is therefore entitled to summary judgment.

D. *Nurses Wright, Riggs, and Hobson*

Nurses Wright, Riggs, and Hobson seek summary judgment arguing that they did not have the authority to prescribe medications or schedule appointments. They conclude therefore that they could not have been deliberately indifferent to Mr. Gilman's pain or need for treatment for his pain. Mr. Gilman argues, to the contrary, that no inmate is seen without first having some sort of interaction, whether it be in-person or via correspondence, with a nurse. Dkt. 181-1, ¶ 6. It is only after a nurse interaction that an inmate is scheduled with a doctor. *Id.* The interactions that Mr. Gilman had with each nurse will be discussed in turn.

*Nurse Wright*

On October 5, 2015, Mr. Gilman filed an informal grievance complaining that he had not received a cortisone injection following his visit with Dr. Byrd. Dkt. 160-6, ¶ 7; dkt. 160-10, p. 180. Nurse Wright responded that he had received an injection on July 17, 2015, and that injections are given only every 90 days at the discretion of the provider. *Id.* She also told him that he would be seen when Procedure Clinic resumes. *Id.* This is the only time Nurse Wright was responsible for responding to a complaint from Mr. Gilman.

Based on these facts, Nurse Wright is entitled to summary judgment on Mr. Gilman's claims. When Nurse Wright received Mr. Gilman's complaint, it had not been three months since

his last cortisone injection, and she responded that he would receive one when Procedure Clinic resumed. Mr. Gilman has presented no evidence to suggest that Nurse Wright failed to respond appropriately to his complaint or could have done anything further to treat him.

*Nurse Riggs*

On September 18, 2014, Nurse Riggs noted that Mr. Gilman's "condition was not responding to protocols." Dkt. 181-1, ¶ 39; dkt. 181-2, p. 280. On November 29, 2015, Mr. Gilman submitted an HCR asking for the results of his x-ray and a cortisone injection. Dkt. 160-4, ¶ 7; dkt. 160-10, p. 105. Nurse Riggs responded that the results of the x-ray would be reviewed at Chronic Care Clinic. *Id.* On January 3, 2016, Mr. Gilman submitted another HCR stating that he had not received his cortisone injection and had experienced arthritis pain since October 2015. Dkt. 160-10, p. 119. Nurse Riggs reviewed Mr. Gilman's records and responded that he was scheduled for an injection. Dkt. 160-5, ¶ 9; dkt. 160-10, p. 119. On January 7, 2016, Mr. Gilman submitted another HCR requesting to know when his appointment was for the cortisone injection. Dkt. 160-10, p. 122. Nurse Riggs responded that his appointment was set for January 8, 2016. *Id.* On March 19, 2016, Mr. Gilman submitted an HCR form notifying medical staff that his last cortisone injection had worn off. Dkt. 160-5, ¶ 10; dkt. 160-10, p. 139. Nurse Riggs reviewed Mr. Gilman's medical records and responded that he had been scheduled with the doctor. *Id.*

In short, every time Nurse Riggs received a request from Mr. Gilman, she considered the request and his medical records. She noted that he was scheduled to see a doctor who would be able to provide him with treatment. There is no evidence that she ignored his complaints or provided an inadequate or inappropriate response to them. Nurse Riggs is therefore entitled to summary judgment.

*Nurse Hobson*

On November 13, 2015, Mr. Gilman filed a formal grievance again complaining that he had not received his cortisone injection. Dkt. 160-7, ¶ 7; dkt. 160-10, p. 192-93. Nurse Hobson responded to this grievance on November 18, 2015, and told Mr. Gilman that Dr. Byrd had ordered an x-ray and that he would be scheduled for an injection sometime in December. Dkt. 160-10, p. 193. This was the only time Nurse Hobson responded to Mr. Gilman's complaints. Mr. Gilman has not shown that this response demonstrates deliberate indifference to Mr. Gilman's serious medical needs. Nurse Hobson reviewed his complaint and his medical records and determined that his provider was evaluating his condition. There is no evidence to support a conclusion that she knew that the treatment Mr. Gilman was receiving was inappropriate, but failed to do anything about it. She is therefore entitled to summary judgment.

E. *QMA Pearison*

Part of QMA Pearison's duties and responsibilities as a medical assistant included coordinating with the onsite medical provider, in this case Dr. Byrd, to schedule provider appointments. Dkt. 160-4, ¶ 5. She argues that she is entitled to summary judgment because, in this role, she was not deliberately indifferent to Mr. Gilman's medical needs.

QMA Pearison is entitled to summary judgment on Mr. Gilman's claims. Her job was to respond to HCRs and schedule appointments with the provider as necessary. Every time Mr. Gilman submitted an HCR to which QMA Pearison responded, she reviewed Mr. Gilman's concerns and his records and consulted with Dr. Byrd. There is no evidence that QMA Pearison ignored Mr. Gilman's complaints or knew that the treatment he was receiving was inadequate but failed to do anything about it.

F. *Corizon*

Corizon also seeks summary judgment on Mr. Gilman's claims.

Because Corizon acts under color of state law by contracting to perform a government function – providing medical care to correctional facilities – it is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). This means that, to show that Corizon was deliberately indifferent, Mr. Gilman must show that he suffered a constitutional deprivation as the result of an express policy or custom of Corizon. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Social Servs. of New York,* 436 U.S. 658, 690 (1978)). "An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (citing *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011)).

Corizon argues that there is no evidence of a practice or policy that resulted in the deprivation of Mr. Gilman's rights. In response, Mr. Gilman has presented testimony from other inmates stating that Corizon had delayed or denied them treatment for their painful medical conditions. Mr. Gilman's assertion of a few other inmates who also allege delays in receiving care is insufficient to create a question of fact regarding whether Corizon had a widespread practice of delaying medical care. *Cf. Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (requiring a series of constitutional violations to raise an inference of a policy on the part of a municipal defendant). Moreover, the undisputed evidence shows that the care Mr. Gilman received was within the standard of care. Thus, no reasonable jury could conclude that Mr.

Gilman suffered from deliberate indifference on the part of any of the individual defendants. Therefore, Corizon cannot be held liable. *See Horton v. Pobjecky*, 883 F.3d 941, 954 (2018) ("'A municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.'") (quoting *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010)).

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [159], is **granted**. Judgment consistent with this Order and the Order of August 10, 2016, (dkt. 8) screening Mr. Gilman's complaint pursuant to 28 U.S.C. § 1915A, shall now issue.

**IT IS SO ORDERED.**

Date: 8/20/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAMES E. GILMAN
110906
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel